**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ROCHELLE JOHNSON,
Plaintiff, Case No.:
v.

ADVENTIST HEALTH SYSTEM/SUNBELT, INC.,
d/b/a ADVENTHEALTH,
Defendant.
_______________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Rochelle Johnson, by and through her undersigned counsel, brings this action against Defendant Adventist Health System/Sunbelt, Inc. d/b/a AdventHealth, and alleges as follows:

## INTRODUCTION

This is an action for damages and equitable relief arising from Defendant's unlawful retaliation against and interference with the protected rights of Plaintiff Rochelle Johnson under the Family and Medical Leave Act of 1993 ("FMLA"), and for retaliation under the Florida Private Sector Whistleblower Act. Defendant terminated Plaintiff after more than ten years of dedicated, high-performing service, on the same day her FMLA extension was confirmed, while she remained actively covered under FMLA intermittent leave for a chronic autoimmune

condition, and in the aftermath of an internal Employee Relations investigation that she had initiated against her supervisor's retaliatory conduct.

## JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over Plaintiff's FMLA claims pursuant to the enforcement provisions of the FMLA, 29 U.S.C. § 2617.

2. This Court has supplemental jurisdiction over Plaintiff's Florida Private Sector Whistleblower Act claim, as it arises from the same nucleus of operative facts as Plaintiff's federal claims.

3. Venue is proper in this District because the Defendant maintains its principal place of business at 900 Hope Way, Altamonte Springs, Florida 32714, the employment relationship existed within this District, and the events and omissions giving rise to this action occurred within the Middle District of Florida.

## PARTIES

4. Plaintiff Rochelle Lynn Johnson is an individual residing in Valrico, Florida.

5. Defendant Adventist Health System/Sunbelt, Inc. d/b/a AdventHealth is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 900 Hope Way, Altamonte Springs, Florida 32714. Defendant is an employer within the meaning of the

FMLA, employing fifty or more employees within a seventy-five-mile radius during each of the twenty or more calendar workweeks relevant to this action.

## FACTUAL ALLEGATIONS

6. Plaintiff began her employment with Defendant on June 1, 2015. Over the course of approximately ten years, she advanced steadily within the organization. She was hand-selected by leadership in 2016 to oversee division-wide coding operations and ultimately served as Director of Coding Operations within the Physician Support 3 department.

7. Plaintiff suffers from a chronic autoimmune condition that constitutes a "serious health condition" within the meaning of the FMLA. Through New York Life Group Benefit Solutions ("NYL GBS"), Defendant's FMLA administrator, Plaintiff was approved for intermittent FMLA leave beginning November 7, 2024, authorized for up to 472 hours (11.8 weeks) of intermittent leave, with coverage running through April 21, 2026.

8. In January 2025, upon returning from leave, Plaintiff observed that she was being treated differently by her Executive Director, Regan Tyler ("Tyler"), and raised her concerns with Tyler.

9. On February 5, 2025, Plaintiff initiated a Microsoft Teams conversation with Monica Rivas, J.D., Senior Employee Relations Representative, to inquire about what constitutes retaliation after reporting her leader to HR based

on how she was being treated. HR acknowledged the concern, scheduled a same-day call, and on February 6, 2025, Plaintiff sent a follow-up email to Rivas documenting their conversation and providing evidence of Tyler's treatment of her.

10. This communication constitutes protected activity under the FMLA, and it places Defendant on notice of Plaintiff's concerns regarding retaliation connected to her FMLA usage.

11. On April 10, 2025, Plaintiff attended an FMLA medical appointment and communicated the appointment to Tyler via email.

12. On April 11, 2025, the day after Plaintiff's FMLA appointment, Tyler issued a Written Corrective Action against Plaintiff, with CFO/SVP Kelly Pettijohn as a witness. The corrective action was approved and transmitted via DocuSign by Employee Relations Representative Monica Rivas, J.D., the same HR representative to whom Plaintiff had reported retaliation concerns less than one week earlier.

13. The April 11th corrective action alleged performance deficiencies and financial harm, neither of which were documented or supported, and skipped required preliminary steps such as coaching or a performance improvement plan. No prior corrective action existed in Plaintiff's nearly ten-year employment record.

14. On April 12, 2025, Plaintiff notified Tyler via email that she would need FMLA leave for upcoming appointments on April 14, 16, and 17, 2025.

15. During the week of April 14–17, 2025, in which Plaintiff had three FMLA appointments, Tyler sent numerous emails to Plaintiff individually, breaking apart email threads that included Plaintiff's direct reports, who were covering her work while she was on FMLA leave, thereby allowing Tyler to individually ask Plaintiff for status updates on matters that had already been resolved and to which her direct reports were copied.

16. On April 21, 2025, Plaintiff emailed HRBP Manager Jackie Hadala ("Hadala") regarding ongoing pressure to sign the April 11 corrective action despite Plaintiff having previously elected not to sign, and to raise her concerns about retaliation.

17. On April 30, 2025, Coding Manager Erin Alford gave her 30-day notice, citing the treatment she experienced from Tyler and the denial of additional staffing Plaintiff had requested in March 2025. Tyler subsequently informed others that Alford had left because Plaintiff failed to secure additional staffing, a false narrative Tyler incorporated into Plaintiff's annual TalentCare review.

18. In June 2025, HRBP Manager Hadala instructed Plaintiff to file an interim pay request for herself and Coding Manager Rosemarie Ortiz to

compensate for absorbing Alford's workload and her 18 coders. Tyler thereafter denied the interim pay request for both Plaintiff and Ortiz.

19. During a Microsoft Teams call in June 2025 between Tyler and Ortiz, in which Tyler's Microsoft Co-Pilot facilitator captured the conversation, Tyler stated, after Ortiz reminded her that Plaintiff was on FMLA, that Plaintiff as director should be handling the full workload of Alford in addition to her own director duties. Following that call, Tyler issued a corrective action against Ortiz without Plaintiff's knowledge, despite Plaintiff being Ortiz's direct supervisor.

20. This conduct is internally contradictory: Defendant cannot simultaneously argue that Plaintiff was performing her role so inadequately as to warrant a corrective action, while also expecting her to absorb the full scope of a departed manager's duties, duties whose scope was evidenced by Defendant's subsequent creation of five new manager positions to fill the void left by Alford's departure.

21. On July 16, 2025, Plaintiff emailed Hadala, Rivas, and Tyler to inquire about the impact of the April 11 corrective action on her annual raise and bonus eligibility. Defendant applied a base pay freeze attributable to the corrective action.

22. On July 17, 2025, Tyler conducted Plaintiff's TalentCare (annual review) call, during which Tyler did not address TalentCare items until

approximately the 43-minute mark. Tyler did not complete and sign her portion of the TalentCare evaluation until July 31, 2025. Once submitted, the evaluation contained a false narrative, which Plaintiff subsequently disputed in written communications to Hadala, HRBP Director Lissedy Garcia, and Rivas.

23. In early August 2025, Defendant's Employee Relations department opened a formal investigation into Plaintiff's reports regarding Tyler. On August 6, 2025, Plaintiff had a call with Hadala in which she reported feeling she was in a hostile work environment, was being retaliated against, and felt unsafe dealing with Tyler alone.

24. On August 25, 2025, Plaintiff submitted evidence to Rivas documenting Tyler's disregard for Plaintiff's FMLA status and was instructed to continue providing evidence in support of her complaints.

25. On October 2, 2025, Rivas informed Plaintiff via Microsoft Teams that the investigation had been closed and that Title VII findings were "unsubstantiated." Rivas acknowledged that ongoing concerns existed but stated they fell outside the scope of her Title VII investigation.

26. On October 6, 2025, Plaintiff submitted a FMLA extension request to NYL GBS.

27. On October 23, 2025, NYL GBS issued a Leave Status Determination confirming Plaintiff's FMLA intermittent leave was approved and extended

through March 3, 2026, under FML Leave with 399 hours of FMLA leave remaining.

28. On October 23, 2025, the same day as the FMLA extension notice, Plaintiff joined her regular Thursday 11:30 A.M. one-on-one meeting with Tyler via Microsoft Teams. HRBP Manager Hadala unexpectedly joined. Tyler informed Plaintiff that she was terminated effective immediately, providing no reason verbally and instructing her to shut down her computer immediately following the call. Plaintiff was told boxes would be mailed to her home for return of company equipment. A Corrective Action Documentation Form memorializing the termination was transmitted to Plaintiff via DocuSign by Rivas, and was signed by Tyler and witnessed by Hadala on October 23, 2025.

29. The stated bases for termination were: ongoing performance concerns, failure to perform the core functions required for the role to a minimum acceptable level, refusal to communicate and collaborate with leadership, insubordination, failure to follow instructions, multiple requests by internal clients to no longer work with Plaintiff, and failure to comply with AdventHealth expectations for company-wide service standards. No previous corrective action was cited other than the April 11, 2025 written corrective action.

30. In her written comments on the termination form, Plaintiff stated, in part: "I want to state for the record that this termination follows my reporting my

executive director, Regan Tyler, to HR on July 31, 2025, regarding a TalentCare report that did not accurately reflect the facts, and that an investigation was conducted despite being told that there were policies in place to prevent retaliation against employees who came forward with credible concerns. I have now been terminated after the conclusion of this investigation."

31. On October 28, 2025, NYL GBS issued an updated Leave Status Determination confirming that Plaintiff's intermittent FMLA leave was approved through April 21, 2026, with 399 hours of leave remaining as of the date of termination.

32. Plaintiff's termination was carried out while she was actively using approved FMLA intermittent leave, immediately following the close of an Employee Relations investigation she had initiated, without any performance improvement period, and based on vague, unsupported allegations contradicted by Plaintiff's decade-long employment record.

**COUNT I**
**FMLA RETALIATION 29 U.S.C. § 2615**

33. Plaintiff incorporates and realleges paragraphs 1 through 32 as if fully set forth herein.

34. At all relevant times, Plaintiff was an "eligible employee" under the FMLA, having been employed by Defendant for more than twelve months and

having worked the requisite number of hours in the preceding twelve-month period.

35. Defendant is a covered "employer" under the FMLA.

36. Plaintiff engaged in activity protected by the FMLA by: (a) exercising her right to intermittent FMLA leave for a qualifying serious health condition on numerous occasions from November 2024 through October 2025; (b) providing advance notice to Defendant of her need for FMLA leave on multiple occasions; and (c) reporting to Defendant's HR department on multiple occasions, including February 5–6, 2025, April 21, 2025, August 6, 2025, and August 25, 2025, that she was experiencing retaliation in connection with her FMLA usage.

37. Defendant took materially adverse employment actions against Plaintiff, including: (a) issuing a Written Corrective Action on April 11, 2025, the day after an FMLA appointment; (b) directing a pattern of harassing communications at Plaintiff during her FMLA leave week of April 14–17, 2025; (c) applying a pay freeze attributable to the April 11 corrective action; (d) incorporating a false narrative into Plaintiff's annual performance evaluation in July 2025; (e) denying Plaintiff's interim pay request while simultaneously demanding she absorb a departed manager's full workload; and (f) terminating Plaintiff's employment effective October 23, 2025, while she remained under active FMLA coverage with 399 hours of leave remaining.

38. A causal connection exists between Plaintiff's protected FMLA activity and each adverse employment action, as demonstrated by: the close temporal proximity between each FMLA event and the adverse action that followed; the progressive escalation of adverse actions each time Plaintiff engaged in protected activity; the fact that the HR representative to whom Plaintiff reported retaliation was the same person who approved and transmitted each adverse action document; and the false and unsupported nature of all performance-based justifications offered by Defendant.

39. Defendant's stated reasons for the adverse actions are pretextual. Plaintiff's termination form cited no new incidents and rested entirely on the same vague, undocumented allegations that formed the April 11 corrective action, all of which are contradicted by Plaintiff's ten-year employment history, the absence of any prior discipline, and the fact that Defendant simultaneously burdened Plaintiff with additional managerial duties beyond her job description while purporting to terminate her for failing to perform her core functions.

40. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered lost wages, lost employment benefits, loss of future earning capacity, and other damages

**WHEREFORE,** Plaintiff demands judgment against Defendant for: back pay and all lost employment benefits; front pay or reinstatement; liquidated

damages for willful violations; compensatory damages; attorney's fees and costs as authorized by 29 U.S.C. § 2617(a)(3); and all other relief this Court deems just and proper

**COUNT II**
**FMLA INTERFERENCE 29 U.S.C. § 2615(a)(1)**

41. Plaintiff incorporates and realleges paragraphs 1 through 32 as if fully set forth herein.

42. Plaintiff was an eligible employee under the FMLA entitled to take intermittent leave for her chronic autoimmune condition.

43. Defendant interfered with, restrained, and denied Plaintiff's exercise of her FMLA rights by: (a) issuing a corrective action on April 11, 2025, the day after a documented FMLA appointment, thereby discouraging and chilling Plaintiff's ongoing use of FMLA leave; (b) sending repeated emails to Plaintiff during her FMLA leave week of April 14–17, 2025, demanding updates on matters already delegated and resolved, thereby creating pressure to work during protected leave; (c) denying Plaintiff's interim pay request after acknowledging she was on FMLA and expecting her to perform a departed manager's full duties, thereby penalizing her FMLA usage; (d) directing a corrective action against Plaintiff's direct report Ortiz after Ortiz reminded Tyler that Plaintiff was on FMLA, thereby creating a chilling effect on employees supporting or acknowledging Plaintiff's FMLA leave; and (e) terminating Plaintiff on October 23,

2025, while she remained under active FMLA coverage with 399 hours of approved intermittent leave remaining.

44. Defendant had actual knowledge of Plaintiff's FMLA rights and usage at all relevant times, having approved and administered Plaintiff's leave through NYL GBS.

45. Defendant's interference denied Plaintiff the benefits, protections, and rights to which she was entitled under the FMLA.

46. As a direct and proximate result of Defendant's interference, Plaintiff has suffered lost wages, lost employment benefits, and the loss of FMLA-protected leave to which she was entitled.

**WHEREFORE,** Plaintiff demands judgment against Defendant for: back pay and all lost employment benefits; front pay or reinstatement; liquidated damages for willful violations; compensatory damages; attorney's fees and costs as authorized by 29 U.S.C. § 2617(a)(3); and all other relief this Court deems just and proper.

## COUNT III
## FLORIDA PRIVATE SECTOR WHISTLEBLOWER ACT Fla. Stat. § 448.102

47. Plaintiff incorporates and realleges paragraphs 1 through 32 as if fully set forth herein.

48. At all relevant times, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of the Florida Private Sector Whistleblower Act.

49. Plaintiff objected to and refused to acquiesce in her employer's activities, policies, and practices that she reasonably believed violated applicable law, including the FMLA, by reporting Tyler's retaliatory conduct to Defendant's HR department on multiple occasions, challenging the false and retaliatory performance evaluation submitted by Tyler in July 2025, and filing a formal complaint regarding Defendant's disregard of her FMLA status in August 2025.

50. Defendant retaliated against Plaintiff for engaging in activities protected by Fla. Stat. § 448.102 by issuing the April 11, 2025 corrective action, incorporating a false narrative into Plaintiff's annual performance evaluation, denying Plaintiff's interim pay request, and ultimately terminating Plaintiff's employment on October 23, 2025.

51. Prior to the filing of this action, Plaintiff provided Defendant with written notice of her claims through a demand letter from her counsel dated November 14, 2025, addressed to Defendant's Chief Executive Officer, Chief Culture & Transformation Officer, and Executive Vice President & Chief Legal Officer, affording Defendant a reasonable opportunity to respond before litigation was initiated.

52. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered lost wages, lost employment benefits, loss of future earning capacity, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against Defendant for: back pay; front pay or reinstatement; compensatory damages; attorney's fees and costs; and all other relief this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated this 27th day of April, 2026.

**FLORIN | GRAY**

*/s/ Troy Longman II*
**Troy Longman II, Esq.**
Florida Bar No.:1031921
tlongman@floringray.com
**Wolfgang M. Florin, Esq.**
Florida Bar No.: 907804
wflorin@floringray.com
16524 Pointe Village Drive,
Suite 100 Lutz, FL 33558
Telephone (727) 220-4000
Facsimile (727) 483-7942

*Trial Attorneys for Plaintiff*